930 So.2d 635 (2006)
WYETH, INC., f/k/a American Home Products, a Pennsylvania corporation and Wyeth Pharmaceuticals, f/k/a Wyeth-Ayerst Pharmaceuticals, Inc., a Delaware corporation, Appellants,
v.
Arlene GOTTLIEB, individually and on behalf of all others similarly situated, Appellee.
No. 3D05-491.
District Court of Appeal of Florida, Third District.
February 15, 2006.
Rehearing and Rehearing Denied June 16, 2006.
*636 Cooney, Mattson, Lance, Blackburn, Richards & O'Connor and Michael Mattson *637 and Ace J. Blackburn, Jr. and Warren B. Kwavnick; Bruce S. Rogow, Fort Lauderdale; Williams & Connolly and John W. Vardaman and F. Lane Heard, III, Washington, DC, for appellants.
Stanley M. Rosenblatt and Jonathan R. Rosenn, Miami, and Marilyn Ducato; Christopher Lynch, for appellee.
Before COPE, C.J., and WELLS, and CORTIÑAS, JJ.
Rehearing and Rehearing En Banc Denied June 16, 2006.
CORTIÑAS, Judge.
In this prescription drug medical monitoring class action, the Defendants, Wyeth, Inc., f/k/a American Home Products, and Wyeth-Pharmaceuticals, f/k/a Wyeth-Ayerst Pharmaceuticals, Inc., (collectively "Wyeth") appeal from a non-final order granting plaintiff's, Arlene Gottlieb's, Motion for Class Certification. We reverse.

I. BACKGROUND
Prempro is a hormone therapy drug consisting of conjugated estrogen and progestin prescribed to prevent symptoms associated with menopause, osteoporosis, and heart disease. The use of conjugated estrogen and progestin is commonly referred to as hormone replacement therapy. Wyeth manufactures, distributes, and sells pharmaceuticals, including the prescription drug, Prempro.
In 1994, the United States Food and Drug Administration ("FDA") approved the marketing of Prempro and, in 1995, approved the current form of Prempro, with estrogen and progestin combined in a single tablet. Wyeth then began marketing Prempro as a single pill.
In 2002, the Women's Health Initiative ("WHI") released certain findings of a clinical trial and observation study, which was a long-term national health study examining the effects of conjugated estrogen and progestin on the prevention of heart disease, hip fractures, and any associated risks of breast cancer or colon cancer. The Study was sponsored by the National Institutes of Health ("NIH") and was monitored by an independent data and safety monitoring board ("DSMB"). Based on the results of the Study, the DSMB concluded that the evidence of risk of breast cancer, along with evidence for increased risks of coronary heart disease, stroke and pulmonary embolism, outweighed the evidence of benefits of Prempro.
In 2003, Wyeth added a black-boxed warning in the labeling insert of Prempro, stating, among other things, that Prempro should not be used for the prevention of cardiovascular disease and advising users of the WHI findings. Wyeth also sent a letter to physicians advising them of the WHI results. Additionally, Wyeth reduced its dosage of Prempro to the lowest possible effective dose. Nevertheless, even with the WHI findings, the higher-dosage tablet previously manufactured by Wyeth continues to be approved by the FDA.

II. FACTS
Ms. Gottlieb began ingesting Prempro in 1998. In 2002, after learning about the results of the WHI Study, Ms. Gottlieb decided to stop taking Prempro. She has not been diagnosed with any type of cancer or cardiovascular disease as a result of her use of Prempro.
In her class action complaint, Ms. Gottlieb requests relief in the form of a medical monitoring program funded by Wyeth and supervised by the court pursuant to Petito v. A.H. Robins, Co., Inc., 750 So.2d 103 (Fla. 3d DCA 1999), which recognized medical monitoring as a cognizable cause of action in Florida despite the absence of present physical injury or symptomatic disease. The complaint asserts that Wyeth was negligent in testing, manufacturing, *638 formulating, labeling, marketing, distributing, or selling Prempro, and surveilling the adverse effects of Prempro and that, as a result of Wyeth's negligence, Ms. Gottlieb and similarly situated class members have been exposed to a hazardous substance which causes a significantly increased risk of contracting serious latent diseases. The complaint alleges that medical monitoring is medically and reasonably necessary to provide for the early detection and prevention of latent diseases and death, minimize damage to consumers of Prempro, and minimize the liability and damages ultimately payable by Wyeth.
In 2004, Ms. Gottlieb filed a motion for class certification, seeking to certify a class defined as "[a]ll women who have taken Prempro and/or conjugated estrogen and progestin in the State of Florida." The trial court granted her motion after conducting extensive hearings, but redefined the class as:
Asymptomatic women who are residents of Florida and who were prescribed and regularly took Prempro for a minimum of six (6) months, while residing in Florida, prior to the black-boxed FDA mandated warnings in January, 2003.
Subclass: All asymptomatic Florida women in the Class who switched to lower-dose Prempro or who continued taking the higher-dose versions, after the WHI study results and/or the black-boxed warnings in January, 2003.
Wyeth appeals arguing that the trial court abused its discretion in granting the motion for class certification because individual issues prevail over the common or typical elements. See Goldfarb v. Ins. Co. of N. America, 642 So.2d 586, 587 (Fla. 3d DCA 1994).
Wyeth claims that Prempro continues to be approved as safe and effective by the FDA, and that no federal or state court has certified a medical monitoring class action involving a prescription drug, especially for a prescription drug that the FDA currently considers safe and effective. See generally In re Baycol Prods. Litig., 218 F.R.D. 197, 204 (D.Minn.2003)(denying medical monitoring class certification involving a drug intended to lower cholesterol due to the absence of medical monitoring recommendations from the medical community and because individual issues existed among the class members which destroyed the cohesive nature of the class claims). Wyeth also contends that individual issues, such as exposure, negligence, and causation, not only exist, but defeat any common issues of fact and law and clearly predominate over class-wide issues.
On the other hand, Plaintiffs urge this court to affirm the trial court's certification order because individual risk factors and other differences among the putative class members do not defeat certification, just as individual differences and independent risk factors did not impact the results of the WHI Study. Plaintiffs allege that Prempro was hazardous and exposed women to substantially increased risks of developing latent diseases, regardless of the woman's independent risk factors.

III. DISCUSSION
To grant class action certification, the trial court must conduct a rigorous analysis to determine that the elements of Florida Rule of Civil Procedure 1.220, the class action rule, have been met. Ortiz v. Ford Motor Co., 909 So.2d 479, 480-81 (Fla. 3d DCA 2005)(citing Baptist Hosp. of Miami, Inc. v. Demario, 661 So.2d 319, 321 (Fla. 3d DCA 1995)). The party seeking class certification bears the burden of pleading and proving the elements required for certification. Execu-Tech Bus. Sys., Inc. v. Appleton Papers, Inc., 743 So.2d 19, 21 (Fla. 4th DCA 1999). *639 The requirements under Rule 1.220(a) for class action certification are that: (1) the members of the class are so numerous that a separate joinder of each member is impracticable; (2) the claim of the representative party raises questions of law or fact common to questions of law or fact raised by the claim of each member of the class; (3) the claim of the representative party is typical of the claim of each member of the class; and (4) the representative party can fairly and adequately represent the interests of each member of the class. See Fla. R. Civ. P. 1.220(a); Ortiz, 909 So.2d at 481. In addition to satisfying Rule 1.220(a), the plaintiffs must also satisfy one of the subdivisions of Rule 1.220(b). The subdivisions applicable to the instant case are contained in sections (b)(2) and (b)(3). Section (b)(2) requires that the class claims be cohesive. Fla. R. Civ. P. 1.220(b)(2); see also Chase Manhattan Mort. Corp. v. Porcher, 898 So.2d 153, 158-59 (Fla. 4th DCA 2005)(defining cohesiveness as class members who share "common characteristics" or enjoy a pre-existing relationship). Section (b)(3) requires that common questions of law or fact predominate over the individual questions of the separate members. Fla. R. Civ. P. 1.220(b)(2); see also Volkswagen of America, Inc. v. Sugarman, 909 So.2d 923, 924 (Fla. 3d DCA 2005). The 1.220(b)(3) requirement parallels the commonality requirement under 1.220(a), in that both require that common questions exist, but the 1.220(b) predominance requirement is more stringent since common questions must pervade.

A. NUMEROSITY
As to the requirement of numerosity under Rule 1.220, Plaintiffs allege that the statewide class consists of thousands of women, so numerous that joinder of all members is impracticable. Wyeth does not dispute that the proposed class is sufficiently numerous. However, even if Plaintiffs are able to meet this numerosity prong of Rule 1.220(a), they must nonetheless establish that issues of law and fact are common to the class.

B. COMMONALITY
Plaintiffs claim that they satisfy the commonality requirement of Rule 1.220 because all class members share common issues of law and fact such as whether (1) Wyeth was negligent in failing to make lower-dose Prempro available prior to 2003, (2) the high-dose Prempro is a hazardous substance, (3) special monitoring procedures exist for the early detection of latent diseases caused by Prempro, (4) Wyeth failed to test or improperly tested Prempro before placing it on the market, and (5) Wyeth was negligent for failing to issue adequate warnings concerning the risks associated with the use of Prempro. Plaintiffs further allege that the medical monitoring program will be identical for all class members and that the elements for a medical monitoring program, pursuant to Petito, can be established through common proof.
In contrast, Wyeth argues that individual issues pervade in this case because members of the class used Prempro in different dosages for different periods of time and some members were aware of the risks associated with Prempro while others were not. Furthermore, some class members may have independent risk factors for breast cancer or other diseases at issue, which may warrant special medical monitoring apart from any past Prempro use. Wyeth contends that Plaintiffs did not establish the commonality of their claims because individual issues, such as exposure, negligence, and causation predominate over any common issues. See Ortiz, 909 So.2d at 480-82. In Ortiz, we found that, even when some common issues of fact exist, a class action cannot be certified *640 if individual inquiries prevail over those common issues. Ortiz, 909 So.2d at 481.
Although we are not to decide the merits of this action or Plaintiffs' right to relief, we nonetheless recognize that evidence pertinent to the determination of the commonality requirement is often intertwined with the merits. See Rink v. Cheminova, Inc., 203 F.R.D. 648, 661 (M.D.Fla.2001). Thus, we will consider whether the elements of a medical monitoring claim can be established through common proof. See id.
In Petito, we articulated that the following elements must be met in order to state a claim for medical monitoring:
(1) exposure greater than normal background levels; (2) to a proven hazardous substance; (3) caused by the defendant's negligence; (4) as a proximate result of the exposure, plaintiff has a significantly increased risk of contracting a serious latent disease; (5) a monitoring procedure exists that makes the early detection of the disease possible; (6) the prescribed monitoring regime is different from that normally recommended in the absence of the exposure; and (7) the prescribed monitoring regime is reasonably necessary according to contemporary scientific principles.
Petito, 750 So.2d at 106-07. The injury in a medical monitoring case is defined as the quantifiable costs of periodic medical examinations necessary to detect the onset of physical harm. See id. at 106; Albertson v. Wyeth, No. 002944, 2005 WL 1048779 (Pa.Ct.Com.Pl. Apr. 26, 2005). It is preferable that Plaintiffs "recover these costs through a court supervised and administered trust fund instead of through lump sum damage award because a trust fund compensates the plaintiff only for the monitoring costs actually incurred, limiting defendants' liability." Albertson, 2005 WL 1048779, at *8.
In the instant case, Plaintiffs failed to show that proving the Petito elements would involve questions of fact common to the class as a whole. For instance, the hazardous nature of Prempro has not been proven as it continues to be approved as safe and effective by the FDA. In fact, Ms. Gottlieb's own physician continues to prescribe Prempro. Moreover, Plaintiffs' own expert, Dr. Siegel, testified that Prempro is hazardous only if prescribed for cardiovascular conditions, which is not a use approved by the FDA. Ms. Gottlieb testified that she was not prescribed Prempro to prevent cardiovascular problems. Instead, she ingested Prempro to prevent the onset of osteoporosis. Therefore, Ms. Gottlieb cannot prove that she was exposed to a hazardous substance, which therefore makes her an inadequate class representative. See infra Part III.C.
Additionally, the element of causation is a highly individualistic determination that depends on the individual characteristics of a putative class member, the duration of the Prempro ingestion, and whether that member was taking other medication along with Prempro. See In re Paxil Litig., 212 F.R.D. 539, 548 (C.D.Cal.2003). In the instant case, Plaintiffs had varying levels of exposure to Prempro, relied on different sources of information when making their decisions to ingest Prempro, and might have risk factors other than those caused by Prempro.
Furthermore, at the hearing on the motion for class certification, testimony from Plaintiffs' expert, Dr. Siegel, demonstrated that Plaintiffs' claims are better addressed individually. Dr. Siegel testified that, aside from ingesting Prempro, a woman's increased risk of breast cancer can be caused by other factors such as family history, not having children until after the age of thirty (30), obesity, and consumption *641 of alcohol. Therefore, proving causation would not involve common issues of fact, and the determination of whether a putative class member has a significantly increased risk of contracting a serious latent disease from Prempro would depend on individual circumstances.
Dr. Siegel's testimony also established that the monitoring program for detecting breast cancer would involve essentially the same medical examinations that menopausal and post-menopausal women are advised to complete regardless of whether they used Prempro. Dr. Siegel additionally testified that monitoring would vary among the different class members, depending on their medical history and individual circumstances. As such, it is questionable, at least as far as the detection of breast cancer, whether the monitoring program recommended by Dr. Siegel is different from that normally recommended in the absence of the exposure.
Besides breast cancer monitoring, the physical examinations to detect cardiovascular diseases would also vary among individual plaintiffs depending on when they stopped using Prempro, the length of time they ingested it, and their medical histories. As far as detecting any cardiovascular problems, Dr. Siegel admitted that, even though the risks for cardiovascular complications disappear sometime after a woman discontinues Prempro use, he nonetheless recommended a more extensive physical examination than those generally provided by doctors. Thus, Dr. Siegel's testimony again demonstrates that Plaintiffs' claims are more adequately addressed on an individual basis.
Moreover, we agree with the reasoning in Baycol, Albertson, and Zehel-Miller v. Astrazenaca Pharm., LP, 223 F.R.D. 659 (M.D.Fla.2004). In Baycol, the court observed that "negligence claims depend on individual facts  whether there is a breach of duty or the foreseeability of harm will depend on what Defendants knew or should have known at the time [the drug] was prescribed and whether Defendants acted reasonably based on the knowledge [they] had at the time." Baycol, 218 F.R.D. at 208. In the instant case, Plaintiffs' claim that Wyeth was negligent in failing to warn about the risks of certain diseases cannot be established by common proof because class members were prescribed Prempro at many different times over a ten-year period and scientific knowledge has changed and evolved over that time period. Thus, the issue of negligence would require specific proof as to what Wyeth knew at the time each plaintiff was prescribed Prempro. Had Wyeth's knowledge and warnings to its users remained static during the ten-year period, Plaintiffs would have had a much stronger claim that negligence may be shown through common proof.
In Albertson, a Pennsylvania court considered near identical circumstances as in the instant case, involving a claim for medical monitoring based on increased risks of breast cancer associated with the use of Prempro. After reviewing the evidence, the court concluded that "[t]he facts surrounding the Class' negligence claim demonstrate[ ] that proof as to one claimant would not be proof as to all. A myriad of individual causation inquiries exist in determining the level of risk for developing breast cancer." Albertson, 2005 WL 1048779, at *8. Similarly, in Zehel-Miller, a federal court in the Middle District of Florida denied certification for a class of anti-psychotic prescription drug users, holding that "individual questions concerning patient characteristics and medical history, physician involvement, dosage, causation and comparative or contributory negligence, eviscerate any notion *642 that common issues predominate in this case." Zehel-Miller, 223 F.R.D. at 664.
We note that Plaintiffs' reliance on In re Diet Drugs Products Liability Litig., No. 98-20626, 1999 WL 673066 (E.D.Pa. Aug.26, 1999) is misplaced. In Diet Drugs, the court considered a state-wide medical monitoring class for users of Fen-Phen after the FDA withdrew Fen-Phen from the market due to its hazardous public health implications. In re Pennsylvania Diet Drugs Litig., 41 Pa. D. & C.4th 78, 81-82 (Pa.Ct.Com.Pl.1999). Moreover, Diet Drugs involved numerous forms of medical monitoring which were first recommended by the United States Department of Health and Human Services. Id. at 86-87. Those recommendations were issued jointly with the Centers for Disease Control, NIH, the FDA, and other medical organizations. See id. at 86.
Here, neither the FDA, nor any other medical organization, has recommended or developed a medical monitoring program for current or former Prempro users. Thus, the timing of the requested relief presents a very significant obstacle for the Plaintiffs. See In re Propulsid Products Liab., 208 F.R.D. 133, 147 (E.D.La.2002). As the court in Propulsid aptly stated:
Neither the FDA, nor any medical organization or institution, nor anyone else for that matter, except the plaintiff's expert, has recommended or suggested that a program for medical monitoring or a group study of all former Propulsid users be undertaken. . . . In such a situation the courts should not attempt to fill the void. "[T]he courtroom is not the place for scientific guesswork even of the inspired sort. Law lags science[;] it does not lead it."
Id. at 147 (quoting Rosen v. Ciba-Geigy Corp., 78 F.3d 316, 319 (7th Cir.1996)).

C. TYPICALITY AND ADEQUACY OF REPRESENTATION
As for the remaining requirements of typicality and adequacy of representation under Rule 1.220, given the circumstances of this case, we find it unlikely that the named plaintiff, Ms. Gottlieb, has claims similar to those of the putative class, or that she adequately represents the class members. The typicality requirement focuses on the relationship of the class representative's claims to the claims of the class members. Colonial Penn. Ins. Co. v. Magnetic Imaging Sys. I, Ltd., 694 So.2d 852, 854 (Fla. 3d DCA 1997). Ms. Gottlieb alleges that her claim is co-extensive with the class members' claims as she ingested Prempro for several years, remains asymptomatic, and seeks the same relief as the class members.
However, Ms. Gottlieb stopped ingesting Prempro in 2002 upon learning about the WHI Study findings, which was prior to both the black-boxed Prempro warning and Wyeth's release of the lower-dose Prempro. On the other hand, other class members continued using Prempro even after its label and dosage changed. Even if a trial court were to find that Wyeth was negligent prior to 2003, such a finding would not necessarily support a conclusion that Wyeth was negligent in marketing the lower-dose Prempro in 2003, especially because Wyeth's knowledge may have been different prior to 2002.
Additionally, at the class certification hearings, Ms. Gottlieb testified that she neither read the Prempro labels nor saw any advertisements by Wyeth promoting Prempro. Ms. Gottlieb was also warned by her physician about the risk of breast cancer associated with Prempro but continued to use it for menopausal symptoms, while other class members may not have been aware of the risks and may have *643 taken Prempro for other reasons, such as prevention of cardiovascular disease. Finally, Dr. Siegel testified that Ms. Gottlieb was atypical from the other Prempro users because she stopped taking Prempro, on her own, after learning about the WHI Study results.
Since factual differences among the class members' claims and the defenses which Wyeth can assert vary depending on each plaintiff's individual circumstances and conditions, Ms. Gottlieb's claims are not typical of the class. Based on these differences among class members' claims, we must conclude that Ms. Gottlieb's interests are not sufficiently similar to the class and it is possible that Ms. Gottlieb's arguments at trial would be adverse to another class member's claims. Therefore, besides being an atypical plaintiff, Ms. Gottlieb is also not an adequate representative of the putative class. See Broin v. Philip Morris Cos., Inc., 641 So.2d 888, 891 (Fla. 3d DCA 1994)(defining an adequate class representative as one who has interests in common with the proposed class members).

IV. CONCLUSION
Since Plaintiffs have not met their burden of showing that the prerequisites of Rule 1.220(a) have been satisfied, we need not reach the requirements of section 1.220(b). Accordingly, we find that the elements of commonality, typicality, and adequacy of representation have not been prima facie established because individual issues of law and fact exist.
We reverse and remand for decertification of the class.